In re MENDELSOHN.

(Supreme Court, Appellate Division, First Department. May 17, 1912.)

ATTORNEY AND CLIENT (§ 42*)—DISBARMENT OF ATTORNEY—GROUNDS.

Where an attorney procured fraudulent personal injury claims from several clients who were related to him, and obtained settlements upon the same, and in a case he was trying, he permitted one such client, without objection or correction, to testify contrary to an affidavit made by the witness in support of one of these claims, and where he served pleadings in an action purporting to be brought for a woman who was actually injured after she had repudiated his claimed authority, and had refused to authorize him to represent her, or to verify the pleading, his misconduct justified his disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

Disbarment proceedings against Herman S. Mendelsohn. Disbarred.

See, also, 140 App. Div. 936, 125 N. Y. Supp. 1131.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Lorenzo D. Armstrong, of New York City, for petitioner.
William M. K. Olcott, of New York City, for respondent.

INGRAHAM, P. J. The Association of the Bar of the City of New York have preferred two specific charges against the respondent. The first is that the respondent is guilty of fraud and deceit in aiding and abetting his father-in-law, who had instituted an action against the receivers of the Metropolitan Street Railroad Company for injuries caused by the negligence of the company, in the commission of perjury on the trial in the City Court in such action on May 16, 1910; and, second, that the respondent was guilty of fraud and deceit in commencing an action against the president of the Adams Express Company for personal injuries caused to one Rosa Vavosa without authority on her part, and in claiming to have received a retainer from her and authority to commence such action. The referee appointed to investigate these charges has reported that the respondent was guilty under the first charge, but that, as to the second charge, the petitioner had not sustained the burden of proof.

The respondent was married to one Tinie Ryman, and resided with his wife's parents at No. 89 Sheriff street, in the city of New York; there also residing with them two unmarried sisters of his wife. The respondent was a young man 26 years of age, and was duly admitted to practice on the 1st of May, 1907. It does not appear when he was married, but shortly after he was admitted to practice, and in June, 1908, a series of accidents commenced in which the father-in-law and his family were claimed to have been injured, and for which the respondent on their behalf made claims for compensation. The first accident happened on June 14, 1908, on the Brooklyn Rapid Transit Railroad, and the respondent made a claim on behalf of his father-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in-law, sisters-in-law, and his wife against that company. He described his wife by her maiden name, although she was at that time the respondent's wife. He then entered into negotiations with representatives of the railroad company, and finally received from them the sum of $100 in settlement of those three claims. That money was received on the 27th of August, 1908, and the respondent delivered to the representatives of the railroad company general releases from his wife, sisters-in-law, and father-in-law, and divided the money between himself, as the attorney, his wife, and his sisters-in-law. Although his father-in-law claimed to be seriously injured, he does not seem to have participated in this division. On the 31st of July, 1908, his father-in-law and his two sisters-in-law were alleged to have been in another railroad accident on the Interborough Rapid Transit Railroad, and the respondent on their behalf made a claim against that corporation for damages for the injuries that they had sustained. He conducted the negotiations in relation to these claims. The claimants were examined by the representatives of the railroad company, which resulted in an offer of settlement by the railroad company of $200, which offer was accepted; and $200 in cash was paid to the respondent, who paid $150 to the persons claiming to be injured, and deducted $50 for his own services. Then on July 12, 1908, the father-in-law fell down a flight of stairs at his residence No. 89 Sheriff street. On December 28, 1908, the respondent presented a claim to the landlords on behalf of his father-in-law. The making of that claim resulted in negotiations with the Casualty Company of America, and the respondent at the request of its representative prepared a bill of particulars of the injuries that his father-in-law had received. He alleges that he subsequently sent a letter to the company in which he said that he made a mistake in the description of the injuries. He accounts for this mistake by saying that he must have dictated this description of the injuries that his father-in-law had received from a statement that he had of the injuries caused by the Brooklyn accident, and he described the injuries received in the Brooklyn accident on the 14th of June. The Casualty Company denied ever having received the corrected letter. The negotiations to recover for the injuries resulting from the stairway accident continued and finally was settled on March 12th for $60, on which day his father-in-law executed a general release, and of that sum respondent paid $50 to his mother-in-law and kept $10 for his own services. From this it appeared that within a little over a month the father-in-law and his family suffered from three accidents for which they had recovered three separate claims, that the respondent had represented his wife's family in the making of these claims and settlements, and had received the money actually paid to release the claims. In December the father-in-law had a fourth accident on the Delancey street horse car line, resulting from the car starting as he was boarding it. Subsequently, and in February, 1909, the respondent, on behalf of his father-in-law, commenced an action against Joline and Robinson as the receivers of the Metropolitan Street Railroad Company to recover damages for the injuries

caused by this accident, and this action came on for trial on May 16, 1910, in the City Court.

The respondent called as a witness his father-in-law, the plaintiff in the action, and he testified as to the accident and the injuries that he had received. On cross-examination he was examined very fully as to his condition at the time of the accident and as to whether he had ever been injured in any other accident, or had made claims against any other individual or corporation for personal injuries. He testified positively that he had never been injured but once before by any accident, and that was as the result of a collision on the Ninth avenue railroad line which was a couple of years before he testified. That testimony was reiterated over and over again. He was asked whether he had ever fallen down the stairs in his own house and presented a claim to the Casualty Company for personal injuries, and in answer to that question he said he fell down two steps, but was not hurt at all. He was asked whether he made a claim for damages in consequence of that fall and received money to settle that claim, and that testimony was excluded on the objections of his son-in-law and counsel who was conducting the examination. But he said he made no claim to the Casualty Company that he was injured, and stated as a fact that he was not injured at all, but only fell down two steps; that he made no claim against the Casualty Company on account of that injury, presented no claim for that injury through the respondent, his son-in-law, and received no money from the Casualty Company for that claim. An examination of the testimony of the respondent's father-in-law in that case discloses that he testified falsely, and that the respondent conducting the trial heard this testimony of his father-in-law and client without attempting in the least to correct it, but allowed the trial to continue without calling his attention to the fact that he was testifying falsely, and yet the respondent as the attorney for his father-in-law had made these various claims, and conducted the negotiations for their settlement, and received the money from the various corporations responsible for the prior accidents. Before that trial was concluded, the presiding judge for some reason not disclosed ordered a juror withdrawn, and that trial therefore came to an end.

The whole conduct of the respondent was absolutely indefensible, and the excuses that he gave before the referee are entitled to no weight. He says he was so shocked at hearing his father-in-law's testimony and by the realization of the fact that he was guilty of perjury that he lost his head, and so did not attempt to correct the erroneous testimony that was given, for fear, if he did, that he would subject his father-in-law to a prosecution for perjury. Notwithstanding this mental condition into which he was thrown by the fact that his father-in-law was committing perjury, he continued to conduct the trial, continued to object to further questions asked on cross-examination, and endeavored to limit as far as he could his father-in-law's cross-examination. So far as appears by the record, he never made the slightest attempt to correct the testimony, never stated to the court that the facts that the witness had sworn to were false,

and never did anything to relieve himself from responsibility for the false testimony that was given. This is too flagrant a violation of the duty imposed upon an attorney and counsellor at law by his acceptance of the office to be overlooked. If he was willing to sacrifice his professional duty to save his father-in-law from danger because of the crime that he had committed, he certainly is not a proper person to be a member of the profession. We concur with the referee in stating that his explanation is absolutely unsatisfactory, that it really explained nothing, and that his misconduct stands out in bold relief without excuse or palliation.

In relation to the second charge, which, standing alone, in view of the unsatisfactory testimony given in support of it, might not justify disbarment, the methods adopted by the respondent in relation to the claim against the Adams Express Company strongly characterizes the character of the respondent, and strengthens the conviction that he is an improper person to be allowed to remain a member of the profession. One Rosa Vavosa was injured by an express wagon belonging to the Adams Express Company, and taken to St. Vincent's Hospital in an ambulance. An account of the accident was reported to the police station, and was entered on the police blotter. She was there called "Rosie Eavaco, age 56, born in Italy, married, residing at 65 Thompson Street, run down by wagon No. 102 of the Adams Express Company * * * in front of 81 MacDougal Street and sustained a compound fracture of left leg. Attended by Dr. Murphy and removed to St. Vincent's Hospital." This woman remained in the hospital some eight weeks, and was then taken to her home. The accident happened on the 12th of September, 1907, and on September 13th the respondent served a summons on the Adams Express Company in which the plaintiff was named as "Rosie Eavaco" the name on the police blotter, but not the name of the woman who was injured. The respondent then commenced negotiations with the agent of the Adams Express Company to settle the case, but made no attempt to communicate with his client, and finally was told by the attorney representing the Adams Express Company that another action had been commenced on behalf of this woman by another attorney. He then called upon his alleged client when she admitted she had employed the other attorney to bring the action, and that her son-in-law had charge of her claim against the Express Company, and did not wish the respondent to proceed further in the matter. After that information and notwithstanding the repudiation of his authority to proceed, the respondent drew a complaint, again called on the injured woman, and asked her to sign it, which she refused to do. Notwithstanding this notification he served the complaint unverified. The Express Company filed an answer, and he proceeded to place the case upon the calendar. Subsequently the attorney really representing the injured woman settled the case with the Express Company when the respondent made a claim for his fees, which was submitted to the court at Special Term, and rejected.

The respondent's explanation of this performance was that on the 13th of September, 1907, a man named Testa, whom respondent had

met in another case, called on the respondent, and informed him of the accident to this woman, and asked the respondent to accompany him to St. Vincent's Hospital; that he went there and saw the injured woman, Testa acting as interpreter; that, after hearing what was claimed to be her account of the accident, the respondent said he obtained from her a written retainer giving him as a fee 50 per cent. of any recovery, with full authority to settle the case in any way that the respondent saw fit, and to execute all releases and other papers necessary to such settlement with the attorney for the defendant. This paper is typewritten, and apparently from the respondent's statement must have been prepared before going to the hospital. The name stated in the instrument was not the name of the woman, but the incorrect name inserted in the police station record. This instrument was dated September 13, 1907; was signed by the respondent as a witness, and purported to be executed by the injured woman by her fictitious name by her mark. Testa was not produced as a witness, and apparently had disappeared. Except this one interview immediately after the accident when the woman was in the hospital, the respondent made no attempt to see her to obtain from her the facts in relation to the accident, and made no further attempt to ascertain from her whether she understood what she was doing. There was no claim that Testa had any authority from the injured woman to apply to the respondent, and it does not appear how Testa knew of this accident.

What is here indicated is a bold attempt on behalf of an attorney to procure some sort of authority from an injured person to commence an action in her name when she was incapable of signing her name and apparently incapable of executing any instrument, or really appreciating what she was doing. After obtaining this alleged authority, the respondent, so far as appears, did nothing except to serve the summons and try to get some sort of a settlement, until after he was informed that another action had been commenced, and that another lawyer was acting for her, and then, notwithstanding the fact that his authority was repudiated, and that the person for whom he claimed to act as attorney had refused to recognize his authority to bring the action and refused to verify a complaint, he served an unverified complaint, and put the case on the calendar. The strange coincidence of the fictitious name which he used for the correct name of the plaintiff coinciding exactly as it did with the entry in the station house blotter, and the name inserted on the alleged retainer, is certainly not explained. He says in his testimony that he went to the station house after his interview with this woman, and therefore it must have been after the instrument was executed; yet the name used in the instrument, which must have been prepared before he went to the hospital, is the name that appears upon the station house blotter, and is entirely unlike the woman's correct name. It is quite inconceivable that if he had gone to the hospital before going to the station house, and seeing the blotter, he should not at the interview with the woman in the hospital have ascertained her correct name, and his whole story is absolutely improbable and contradicted by all the

circumstances, and certainly not entitled to credence. The injured woman strenuously insists that she had no interview with the respondent at the hospital, and knew nothing about him until he called on her after her removal to her home, when he tried to induce her to sign the complaint. Although the referee was impressed with the contradictions appearing in her testimony, the improbability of the respondent's story, his failure to procure any corroboration as to his visit to the hospital, the methods that his own testimony disclosed as to the way in which he conducted the action against the Express Company, and his proceedings after his authority had been repudiated by the injured woman, all call for the severest condemnation. His testimony about his relations with this man Testa is peculiar. He says he first met him in Harlem some time in the year 1907, more than a year before his interview in relation to this claim against the Express Company. On cross-examination he was unable to state the location of the hospital he said he went to, and does not know what floor he had the interview with the injured woman on. In his complaint he described the leg that was injured in the accident as the wrong leg, and that was the description contained in the police blotter. He does not remember what the woman told him; said he had made a memorandum at the woman's bedside as to her injuries, but had lost the memorandum; and altogether his whole statement is absolutely incredible. The respondent inserted in his complaint that the plaintiff received a compound fracture of her right foot, "and she is informed and verily believes it to be true that said fractured foot will probably have to be amputated." When asked where he got that information from, he said he alleged it on general principles in order to be able to prove it later. He admits he had no such information as to the result of the injury; that he had never been informed that such would be the result of the injury, and his client had refused to verify the pleading, yet he served it as a pleading in the action; that he inserted it upon information and belief, although he had no positive information of anything; that he got all of this information from the police blotter, and not from anything that the woman said.

I think this whole record conclusively shows that this respondent is not fit to be an attorney of this court, and he is therefore disbarred. All concur.